UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHUN WARREN,

                              Plaintiff,

        v.                                        Case No. 23-cv-1208-pp

JENNIFER MCDERMOTT, *et al.*,

                              Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 4) AND SCREENING COMPLAINT UNDER 28 U.S.C. §1915A**

        Shun Warren, an individual incarcerated at Racine Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants failed to institute appropriate safeguards to stop the spread of COVID-19 in September 2020. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 4, and screens his complaint, dkt. no. 1.

**I.     Motion for Leave to Proceed without Prepaying the Filing Fee (Dkt. No. 2)**

        The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then

1

must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On September 26, 2023, the court ordered the plaintiff to pay an initial partial filing fee of $23.80. Dkt. No. 6. The court received that fee on October 25, 2023. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee and will require him to pay the remainder of the filing fee over time in the manner explained at the end of this order.

**II.  Screening the Complaint**

   A.  Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts,

"accepted as true, to 'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    The Plaintiff's Allegations

The complaint names as defendants several officials from Kettle Moraine Correctional Institution (KMCI), where the plaintiff previously was incarcerated, and other officials. Dkt. No. 1 at ¶3. The defendants are Warden Jennifer McDermott, Deputy Warden John Noble, Security Director Thomas Pollard, Unit Manager Tammy Steahler, Unit Manager Cory Sabish, Health Services Manager Judy Ludwig, Unit Manager Kelly Jodar, Sergeant Kretchmann, the Health and Safety Committee, Advance Health Care Provider and Makda

3

Fessahaye, whom the plaintiff says was Administrator of the Division of Adult Institutions (DAI) and of KMCI. Id. at ¶¶4–11, 14–16, 20. The complaint also names two unknown, John/Jane Doe defendants who worked as first shift unit supervising sergeants. Id. at ¶¶12–13. The complaint names all defendants in their individual capacities only. Id. at ¶¶4–16.

The plaintiff alleges that as early as March 23, 2020, Administrator Fessahaye was aware of COVID-19 and the danger it posed to persons incarcerated in DAI institutions. Id. at ¶17. The plaintiff alleges that Fessahaye was responsible for ensuring that DAI institutions followed proper policies and procedures for slowing the spread of COVID-19. Id. at ¶18. He alleges that, to that end, Fessahaye suspended facility transfers within DAI institutions but "was aware of the failures by facilities to follow these policies and procedures." Id. at ¶¶19–20.

The plaintiff alleges that during the second week of June 2020, he was transferred to KMCI. Id. at ¶21. He was placed in Unit 10, which was being used to quarantine persons who had tested positive for COVID-19 or who arrived at KMCI to quarantine with a positive or believed-positive COVID-19 diagnosis. Id. at ¶22. Medical staff examined the plaintiff and tested him for COVID-19, and he tested negative. Id. at ¶23. He says that he nonetheless had to remain in quarantine for at least fourteen days, as did anyone who tested positive. Id. The plaintiff alleges that after twenty-one days, he was transferred to a non-quarantine unit—Unit 16—that he describes as "a dorm like environment." Id. at ¶¶24–26. Persons housed on Unit 16 were told to wear

4

masks, practice social distancing and follow other COVID-19 guidelines. <u>Id.</u> at ¶¶26–27. The plaintiff says incarcerated persons and staff on Unit 16 were screened and tested for COVID-19 "almost daily." <u>Id.</u> at ¶¶28–29. He described Unit 16 as "a Covid-19 free-zone." <u>Id.</u> at ¶30.

The plaintiff alleges that the prison conducted mass testing of its residents and staff on June 24, 2020, but that they did not receive the results back until September 1 and 2, 2020. <u>Id.</u> at ¶30. He says that the results showed that "there was not even one positive Covid case on Unit 16," but that staff were notified that "there existed positive cases." <u>Id.</u> at ¶31. On September 3, 2020, KMCI instituted "a momentary lock-down in the evening," which the plaintiff says "was done to move 'other' inmates that had tested Positive for Covid-19 within the Institution." <u>Id.</u> at ¶32. The plaintiff says that he and others in Unit 16 continued to test negative. <u>Id.</u> He alleges that on September 4, 2020, about twenty-five incarcerated persons were told they were moving to other housing units. <u>Id.</u> at ¶33. The plaintiff says he was told to move to Unit 11 with about eight other incarcerated persons. <u>Id.</u> at ¶34. Staff informed them that six persons had been removed from Unit 11 the previous night after testing positive for COVID-19. <u>Id.</u> The plaintiff says Unit 11 "is a regular housing Unit" in which all persons share a community bathroom, shower, phone "and other living quarters." <u>Id.</u> at ¶35. He says there were between fifty-two and sixty people housed on Unit 11 in double-cell rooms. <u>Id.</u>

The plaintiff alleges that Sergeant Kretchmann told him he would be housed with an incarcerated person named Jose Alverez, whose previous

cellmate had contracted COVID-19. Id. at ¶36. The plaintiff says that Alverez "himself had been feeling sick," as had others on Unit 11. Id. The plaintiff asked to be housed with another person who had been housed in Unit 16 because they all had tested negative for COVID-19. Id. at ¶37. But Kretchmann told him, "No, who I placed you in the cell with is where you'll stay." Id. at ¶38. The plaintiff says he protested that Alverez was feeling ill, and the plaintiff "had a compromised immune system and was concern[ed] with getting sick." Id. Kretchmann reiterated that the plaintiff was not moving and told him "to 'write to'" Unit Managers Steahler and Sabish "if he had an issue." Id. at ¶39.

The plaintiff says he also was not provided cleaning supplies while in Unit 11. Id. at ¶40. The plaintiff says that he asked the John Doe Sergeant on first shift for cleaning supplies. Id. at ¶41. He says the sergeant told him that room cleaning and supplies "were not available after 9.A.M." and that the plaintiff would not be moved to another cell even after he "inform[ed] staff [he has] existing health and cardio issues." Id. The plaintiff alleges that ten persons housed in Unit 11 had been moved to Unit 10 (the quarantine unit) after testing positive, but that other persons who had symptoms remained in Unit 11. Id. at ¶43. He alleges that despite having the quarantine units, Steahler and Sabish "did not stop movement" and "moved a group of Negative cases into a Unit with those that were exposed to COVID; and into rooms with those sick and ill[] [e]xhibiting symptoms." Id. at ¶¶44–45.

The plaintiff says he "eventually became very ill" after being exposed to incarcerated persons who had exhibited symptoms of COVID-19. Id. at ¶46. He

says that around September 8, 2020, he wrote to Steahler, Sabish and Deputy Warden Noble about feeling ill after being housed with a cellmate who was sick. Id. at ¶47. On September 17, 2020, he again wrote to Noble and Health Services Unit Manager Ludwig about his situation "and not being able to sanitize the cell." Id. at ¶48. He told those defendants "about how he was sick and was really concerned about his underlying health issues." Id. On September 15 and 17, 2020, he "explained to Judy Ludwig and Health Services" that he was experiencing severe chest pain and headaches and was coughing up blood. Id. at ¶49. The plaintiff says he received no response to his letters, and there was "no response to correct or change the situation." Id. at ¶50.

The plaintiff alleges that on September 23, 2020, KMCI conducted another mass testing, which revealed "hundreds of cases" of COVID-19 within the prison. Id. at ¶51. The plaintiff says that KMCI "has the ability, space and resources of Units to quarantine and isolate areas to stop the spread" of COVID-19. Id. at ¶52. He says that on October 27, 2020, Fessahaye "acknowledged that KMCI has the bed space and room to contain and hold cases to minimal numbers." Id. at ¶53. He says that Fessahaye "did not ensure that guidelines and protocols were followed in [KMCI] to ensure a safe environment." Id. at ¶54. The plaintiff claims that Fessahaye failed to "properly present and instruct proper notice upon the Administration of [KMCI]'s staff and Administration." Id. at ¶55. He says her failure to "act[] accordingly to

ensure safety violated [his] rights to be free, protected and safe" and constituted negligence. Id. at ¶56.

The plaintiff alleges that Warden McDermott "was informed of the current Covid-19 environment at that time." Id. at ¶57. He says she nonetheless "allowed and choose [*sic*] to allow other staff and Unit Managers to transfer, house and intergrate [*sic*] Negative and Positive cases." Id. The plaintiff asserts that McDermott "has the power and authority; and responsibility to ensure The Plaintiff and others housed in the Institution are safe from exposures of threat, even if it means ceasing movement or proper isolation." Id. He similarly asserts that Noble, as deputy warden, "has a duty to ensure safety" and "has the responsibility under law to ensure all and any harm are not to come to inmates in his care." Id. at ¶¶58–59. He alleges that Pollard as the security director "failed to ensure all Unit Managers and Health Staff were properly implementing the proper rules and guidelines in accordance with the DOC, CDC and DHS." Id. at ¶60. The plaintiff says "[t]he inaction allowed staff under his rule to expose negative cases to positive intergrating [*sic*] among general population," which "exposed [the plaintiff] to an environment where he became extremely ill due to the exposure to Covid-19." Id. He says Steahler and Sabish acted negligently when they moved him from Unit 16, which had no positive cases, to Unit 11, "where there were outbreaks and positive cases." Id. at ¶61.

The plaintiff seeks $700,000 in compensatory and punitive damages under federal and state law. Id. at p.17. He seeks an additional $100,000 in

8

punitive damages and an order that the defendants "Protect with better guidelines." Id.

    C.   <u>Analysis</u>

The plaintiff's allegations challenge the conditions of his confinement. Under the Eighth Amendment, a state may not subject prisoners "to conditions of confinement amounting to cruel and unusual punishment." <u>Giles v. Godinez</u>, 914 F.3d 1040, 1051 (7th Cir. 2019) (citing <u>Rhodes v. Chapman</u>, 452 U.S. 337, 345–47 (1981)). The Supreme Court has clarified, however, that only "extreme deprivations" will amount to cruel and unusual conditions of confinement. <u>Id.</u> (citing <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992)). The court must judge the alleged conditions "in accordance with contemporary standards of decency." <u>Id.</u> (citing <u>Hudson</u>, 503 U.S. at 8, and <u>Rhodes</u>, 452 U.S. at 346).

An Eighth Amendment claim consists of both objective and subjective components. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). In the context of a conditions-of-confinement claim, an incarcerated person must show that he has been deprived of "'the minimal civilized measure of life's necessities.'" <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991) (quoting <u>Rhodes</u>, 452 U.S. at 347). The subjective component requires the plaintiff to demonstrate that prison officials acted with the requisite intent, that is, that the officials acted with "deliberate indifference" to a substantial risk that the plaintiff would suffer serious harm. <u>Farmer</u>, 511 U.S. at 834; <u>Wilson</u>, 501 U.S. at 303.

Other courts in this district have analyzed similar or nearly identical complaints from persons who were incarcerated at KMCI in September 2020

9

and alleged that the prison took inadequate steps to prevent them from contracting COVID-19. The complaint in Williams v. McDermott, *et al.*, Case No. 22-cv-1003 is most analogous to the complaint that the plaintiff filed here. In Williams, the plaintiff sued Warden McDermott, many of the same high-ranking officials that the plaintiff sues here, the Wisconsin Department of Corrections (DOC) and fifty John or Jane Does, alleging that "they did not quarantine individuals with known or suspected cases of Covid-19 and that, as a result, he contracted Covid-19." Williams v. McDermott, Case No. 22-C-1003, 2022 WL 17961667, at *2 (E.D. Wis. Dec. 27, 2022). The Williams complaint provides more background and detail than the complaint in this case, but the allegations focus on the same September 2020 events that the plaintiff says led to hundreds of positive cases of COVID-19 at KMCI. Id. at *2–*3.

In an order screening the complaint, Judge Adelman explained that "[c]ourts have held that the risk of exposure to Covid-19 in prison satisfies the objective standard of an Eighth Amendment claim." Id. at *4 (citing cases). Judge Adelman then sifted through the allegations specific to each of the many named defendants, concluding that "the plaintiff does not state a claim based on his allegations that defendants refused to quarantine prisoners who had close contacts with individuals who had Covid-19 or were suspected to have it." Id. Judge Adelman concluded that

> while the plaintiff describes why he thinks prison officials' response to the Covid-19 pandemic at KMCI was inadequate and caused him to contract Covid-19, the plaintiff has not alleged that any defendant's action or inaction violated his constitutional rights. He seeks damages based on the KMCI's overall response to Covid-19, including their responses to other prisoners, yet he has not alleged

10

that he contacted any prison official regarding his concerns. The plaintiff describes precautions that were taken at KMCI and alleges that staff there did not do enough, and that staff violated institution policy. Even if testing or quarantining was conducted negligently, negligence does not constitute deliberate indifference. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020).

Id. Judge Adelman dismissed the complaint but allowed the plaintiff to file an amended complaint that provided more specific information about the defendants' actions or inaction related to his potential exposure to COVID-19. Id. at *5.

Judge Ludwig more recently issued a screening order for a complaint nearly identical to the complaint filed in Williams. See Martinez v. McDermott, et al., Case No. 23-cv-1209. The complaint, like the complaint in Williams, names Warden McDermott as the lead defendant and names numerous KMCI and WDOC officials and Jane or John Doe defendants. Id., Dkt. No. 1. Also like the complaint in Williams, the Martinez complaint provides extensive background information about the COVID-19 pandemic before alleging the same September 2020 events that led to the outbreak. Id. Judge Ludwig describes the complaint as alleging "Eighth Amendment claims against numerous Defendants because they failed to prevent [the plaintiff] from catching Covid-19 at the height of a worldwide pandemic." Martinez v. McDermott, No. 23-CV-1209-BHL, 2023 WL 6976742, at *2 (E.D. Wis. Oct. 23, 2023). Judge Ludwig's approach is similar to Judge Adelman's in Williams (which is understandable given the nearly identical complaints), and he notes that the complaint acknowledges "that precautions were taken to minimize the spread of the virus, including partial lockdowns, institution-wide testing,

encouraging suspected cases to isolate with limited exceptions, and quarantining confirmed cases." Id. Judge Ludwig similarly rejected the plaintiff's claims against "staff members who allegedly failed to immediately quarantine an inmate who informed them he was not feeling well." Id. at *3. He noted that

> the unidentified staff members responded to the risk, including instructing the inmate to remain in his cell with limited exceptions. The mere fact that they did not respond in the way Martinez would have preferred does not support an inference that they turned a blind eye to the risk of infection. As another court observed during the time in question, "The plain fact is that the country is experiencing a pandemic and cases of COVID-19 are breaking out in prisons and communities across the country. This does not mean that the correctional officers in charge of those prisons are subjecting inmates to cruel and unusual punishment. People, both inside and outside prisons and jails, are cont[r]acting COVID-19 ...." *Coates v. Arndt*, No. 20-C-1344, 2020 WL 6801884, at *2 (E.D. Wisc. Nov. 18, 2020).

Id. Judge Ludwig agreed with Judge Adelman's analysis that the complaint provided insufficient information for the court to "reasonably infer that any Defendant's action or inaction violated his constitutional rights." Id. Judge Ludwig also gave the plaintiff an opportunity to file an amended complaint that better explained the harm that the plaintiff believed the defendants had caused. Id.

These cases are instructive. The complaint in this case does not state a claim against Fessahaye for allegedly knowing about the dangers of COVID-19 but failing to implement effective safeguards against its spread. The complaint only generally alleges that Fessahaye was involved; it does not allege that she *personally* acted or failed to act in a way that violated the plaintiff's rights. The

complaint alleges that Fessahaye suspended transfers and instituted other policies and procedures to combat the spread of COVID-19, but that unspecified *staff* at some DAI "facilities" failed to follow those policies or procedures. Dkt. No. 1 at ¶20. As Judge Adelman explained, "vicarious liability is inapplicable to § 1983 suits, [so] a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Williams, 2022 WL 17961667, at *4 (citing Iqbal, 556 U.S. at 676). Here, the complaint's vague allegations about staff at unspecified "facilities" who did not follow COVID-19 procedures or policies do not provide a basis to hold Fessahaye *personally* liable to the plaintiff for contracting COVID-19.

Nor does the complaint state a claim against McDermott, who was the Warden at KMCI in September 2020. The complaint generally alleges that McDermott was aware of COVID-19 and "allowed . . . staff and Unit Managers to transfer, house and intergrate [*sic*] Negative and Positive cases." Dkt. No. 1 at ¶57. This is an attempt to hold McDermott liable for the decisions she made about housing incarcerated persons who had or may have had COVID-19 while she was the warden. But as the court explained above, an official's supervisory position is an insufficient basis for liability. See Iqbal, 556 U.S. at 676–77. The complaint does not explain how any of McDermott's decisions specifically caused or contributed to the plaintiff contracting COVID-19. It seeks to hold McDermott liable for not ceasing all movement or isolating all positive or suspected positive cases. But McDermott's decision not to take a specific

course of action during the September 2020 COVID outbreak, without more, does not amount to deliberate indifference. See Williams, 2022 WL 17961667, at *4 (citing Rowe v. Buss, No. 21-1182, 2021 WL 5232512, at *2 (7th Cir. Nov. 10, 2021)) (concluding that McDermott's "failure to lock down the institution at a specific time does not amount to deliberate indifference").

The same analysis applies to Noble, who the plaintiff says was the deputy warden, and Pollard, who was the security director. The plaintiff generally asserts that Noble and Pollard were responsible for the safety of persons incarcerated at KMCI. He says he wrote to Noble (but not Pollard) about his concerns but did not receive a response. He does not say whether Noble received or reviewed his letter, nor does he allege that Noble or Pollard were personally involved in decisions that caused the plaintiff's illness. These general allegations again seek to hold Noble and Pollard liable because they held supervisory positions at KMCI during the September 2020 COVID-19 outbreak. That Noble and Pollard had a general responsibility to those incarcerated at KMCI does not mean that they also were *personally* responsible for the plaintiff getting sick from this specific incident. See Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000) (explaining that the plaintiff "must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right").

The plaintiff alleges that Unit Managers Steahler and Sabish negligently moved him from Unit 16 (where there were no positive cases) to Unit 11 (where there had recently been positive cases). The plaintiff may be correct that

Steahler and Sabish did not respond perfectly to the COVID-19 outbreak at KMCI in September 2020. But as another court in this district stated in a similar case, "The key inquiry is not whether the defendants perfectly responded or whether their efforts ultimately averted the risk; instead, the key inquiry is whether they 'responded reasonably to the risk.'" Thomas v. McDermott, No. 23-CV-734-JPS, 2023 WL 6463046, at *3 (E.D. Wis. Oct. 4, 2023) (quoting Wilson v. Williams, 961 F.3d 829, 840 (6th Cir. 2020)). The complaint alleges that Steahler and Sabish moved persons who tested positive *out* of Unit 11 and into Unit 10, a quarantine unit. That suggests that they acted reasonably to mitigate the spread of COVID-19. Many other persons (including the plaintiff) nonetheless contracted the disease. Even if Steahler and Sabish made mistakes as unit managers during the COVID crisis at KMCI in September 2020, neither those mistakes nor their alleged negligence is a basis for liability under §1983. See Williams, 2022 WL 17961667, at *4 (E.D. Wis. Dec. 27, 2022) (citing Hildreth, 960 F.3d at 426).

The complaint does not contain sufficient allegations to state a claim against defendants Ludwig and Jodar. The plaintiff alleges only that he wrote to Ludwig about his concerns on two occasions but did not receive a response. The complaint alleges nothing at all against Jodar. The plaintiff does not say what role either of these defendants had, if any, in him contracting COVID-19 at KMCI in September 2020. Because the complaint does not explain how either of these defendants personally "caused or participated in a constitutional violation," it fails to state a claim against them. Hildebrant v. Ill. Dep't of Nat.

Res., 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)).

The complaint seeks to proceed against Sergeant Kretchmann, who moved the plaintiff into a cell with Alverez despite the plaintiff's concern that Alverez was feeling sick. The plaintiff alleges that Kretchmann did not allow him to move to another cell but advised him to write to the unit managers. He similarly alleges that one of the John Doe sergeants denied his request to move to another cell and denied him cleaning supplies on one occasion because they were not available at the time. The plaintiff does not have a constitutional right to placement in a certain cell, especially during an emergency situation like the COVID-19 pandemic. See Meachum v. Fano, 427 U.S. 215, 225 (1976); Brown v. Cromwell, Case No. 22-CV-010-BHL, 2022 WL 489529, at *3 (E.D. Wis. Feb. 16, 2022) (citing Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020); and Lindh v. Hepp, Case No. 21-C-801, 2021 WL 3473141, at *4 (E.D. Wis. Aug. 6, 2021)). The plaintiff does not allege that the sergeants had any control over housing assignments; and in fact, he says they told him to contact the unit managers about his cell placement. Nor does he state a claim against the Doe sergeant for explaining institutional rules about cleaning supplies. The sergeants are not liable for following institutional rules or housing assignments with which the plaintiff disagrees. See Burks v. Raemisch, 555 F.3d 592, 595–96 (7th Cir. 2009).

The plaintiff names the Health and Safety Committee as a defendant, but he does not allege what this defendant did to violate his rights. Even if he had,

the Health and Safety Committee, "which [is] part of KMCI and the DOC, [is] not subject to suit under 42 U.S.C. § 1983." Williams, 2022 WL 17961667, at *3 (citing Johnson v. Supreme Court of Ill., 165 F.3d 1140, 1141 (7th Cir. 1999) ("[S]tates and their agencies are not 'persons' subject to suit under 42 U.S.C. § 1983.")). The court will not allow the plaintiff to proceed against the Health and Safety Committee.

The complaint also contains no allegations against Advance Health Care Provider. It says only that Advance Health Care "was active Advance Health Care Provider at [KMCI]" at the time of the alleged events. Dkt. No. 1 at ¶15. The court can infer that Advance Health Care is a corporation that provides health services to incarcerated persons. A private corporation that has contracted to provide essential government services, such as health care for incarcerated persons, may be held liable only when "the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." Shields v. Ill. Dep't of Corr., 746 F.3d 782, 789 (7th Cir. 2014). The complaint says nothing about Advance Health Care's policies or customs and does not suggest it followed one that led to the violation of the plaintiff's rights. The complaint provides no basis whatsoever for a claim against Advance Health Care.

As in the cases discussed above, the plaintiff's wide-ranging allegations describe why he believes prison officials took inadequate steps to reduce the spread of COVID-19 at KMCI in September 2020. But the complaint does not allege sufficient facts for the court to infer that the actions or inaction of any specific defendant violated the plaintiff's constitutional rights. The complaint

suggests that some KMCI officials may not have followed ideal practices for quarantining incarcerated persons who contracted COVID-19; but that does not mean they acted *indifferently* to the risk that persons incarcerated at KMCI would become sick, particularly given the rapidly changing and uncertain nature of events and guidance in 2020. The plaintiff's allegations *may* suggest that some officials were negligent to the risk that he would contract COVID-19. But as the court explained above, negligence does not violate the Constitution. See Farmer, 511 U.S. at 835–36. Though the plaintiff seeks to proceed on state-law claims, he may not proceed solely under state law under §1983. See Williams, 2022 WL 17961667, at *4 (citing Guajardo-Palma v. Martinson, 622 F.3d 801, 806 (7th Cir. 2010); and Domka v. Portage Cnty., Wis., 523 F.3d 776, 784 (7th Cir. 2008)).

The court will dismiss the complaint because it fails to state a federal claim. Because the plaintiff may be able to state a claim if he provides additional detail, the court will give him an opportunity to amend his complaint to correct the deficiencies noted and better explain the claims in his complaint. When writing his amended complaint, the plaintiff should provide the court with enough facts to answer the following questions: 1) Who violated his constitutional rights?; 2) What did each person do to violate his rights?; 3) Where did each person violate his rights?; and 4) When did each person violate his rights? The plaintiff's amended complaint does not need to be long or contain legal language or citations to statutes or cases, but it does need to

provide the court and each defendant with notice of what each defendant allegedly did or did not do to violate his rights.

The court is enclosing a copy of its amended complaint form. The plaintiff must list the case number for this case on the first page. He must list all the defendants he wants to sue in the caption of the amended complaint. He should use the spaces on pages two and three to explain the key facts that give rise to the claims he wishes to bring, and to describe which defendants he believes committed the violations that relate to each claim. If there is not enough space on those pages, the plaintiff may use up to five additional sheets of paper, double-spaced so that the court can read them. The amended complaint takes the place of the prior complaint and must be complete by itself. The plaintiff may not refer the court back to his original complaint. He instead must repeat in the amended complaint any of the facts from the original complaint that he believes are necessary to his claims.

## III. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 4.

The court **CONCLUDES** that the plaintiff's complaint fails to state a claim. Dkt. No. 1.

The court **ORDERS** that the plaintiff may file an amended complaint that complies with the instructions in this order. If the plaintiff chooses to file an amended complaint, he must do so in time for the court to *receive* it by the end of the day on **April 5, 2024**. If the court receives an amended complaint by

day's end on April 5, 2024, the court will screen the amended complaint as required by 28 U.S.C. §1915A. If the court does not receive an amended complaint by day's end on April 5, 2024, the court will dismiss this case based on the plaintiff's failure to state a claim in his original complaint and will issue him a strike as required by 28 U.S.C. §1915(g).

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$326.20** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Racine Correctional Institution.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs

---

[1] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

Case 2:23-cv-01208-PP   Filed 03/11/24   Page 20 of 21   Document 9

who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin this 11th day of March, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**