UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

SHUN WARREN,

                Plaintiff,

v.                                                         Case No. 23-cv-1208-pp

JENNIFER MCDERMOTT, *et al.*,

                Defendants.

---

**ORDER SCREENING AMENDED COMPLAINT UNDER 28 U.S.C. §1915A AND DISMISSING CASE FOR FAILURE TO STATE A CLAIM**

---

Shun Warren is incarcerated at Racine Correction Institution and is representing himself. On March 11, 2024, the court screened his complaint under 42 U.S.C. §1983 and determined that it did not state a claim. Dkt. No. 9. The court ordered that by April 5, 2024, the plaintiff must file an amended complaint or it would "dismiss this case based on the plaintiff's failure to state a claim in his original complaint and [would] issue him a strike." Id. at 19–20. The court later extended to May 20, 2024 the plaintiff's deadline to file his amended complaint. Dkt. No. 11. On May 28, 2024, the court received the amended complaint. Dkt. No. 12. This decision screens it, concludes that it does not state a claim and dismisses the case.

**I.    Screening the Amended Complaint**

    **A.**    <u>Federal Screening Standard</u>

As the court explained in the previous order, the court must screen complaints brought by incarcerated persons seeking relief from a governmental

entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the amended complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, the amended complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The amended complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d

824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.  The Plaintiff's Allegations

The amended complaint names the same defendants from Kettle Moraine Correctional Institution (KMCI) as the original, omitting only Kelly Jodar and the Health and Safety Committee. Dkt. No. 12 at ¶¶4–14. The amended complaint names defendants Warden Jennifer McDermott, Deputy Warden John Noble, Security Director Thomas Pollard, Unit Manager Tammy Staehler, Unit Manager Cory Sabbish, Health Services Manager Judy Ludwig, Sergeant Kretchmann, two John/Jane Doe Supervisory Sergeants, Advance Health Care Provider and Administrator of the Division of Adult Institutions (DAI) Makda Fessahaye. Id. Unlike the original complaint, the amended complaint names all the defendants in both their individual and official capacities. Id.

The allegations of the amended complaint are nearly identical to those of the original complaint. The plaintiff reiterates that in March 2020, Administrator Fessahaye was aware of COVID-19 and the danger it posed to persons incarcerated in DAI institutions. Id. at ¶15. He alleges that Fessahaye was responsible for ensuring that the institutions followed proper policies and procedures for slowing the spread of COVID-19. Id. at ¶16. The plaintiff avers that Fessahaye initially suspended facility transfers within DAI institutions, but that practice later "was picked back up[] despite the risk of Covid-19." Id.

3

at ¶17. He alleges that Fessahaye "was made aware of the failures by facilities to follow these policies and procedures." Id. at ¶18.

The plaintiff asserts that during the second week of June 2020, he was transferred to Kettle Moraine Correctional Institution. Id. at ¶19. He was placed in Unit 10, which was being used to quarantine persons who tested positive for COVID-19 or who arrived at KMCI with a positive or believed-positive COVID-19 diagnosis. Id. at ¶20. The plaintiff says he tested negative for COVID-19 but had to remain in quarantine for at least fourteen days. Id. at ¶21. The plaintiff alleges that he remained in Unit 10 for twenty-one days "until it was authorized and safe to be transferred to another unit within the institution." Id. at ¶22. He again tested negative for COVID-19 and was transferred to Unit 16, a non-quarantine unit. Id. at ¶¶23–24. He alleges that he remained on Unit 16 for two and a half months, during which time he and all other incarcerated persons were "screened and tested almost daily." Id. at ¶25. He says that no person incarcerated in Unit 16 ever tested positive for COVID-19. Id.

The plaintiff alleges that on August 24, 2020, the prison conducted mass testing of residents and staff but did not receive the results until September 1 and 2, 2020. Id. at ¶26. He says the results showed that "there was not even one positive case on Unit 16," but that staff were notified that "there DID EXIST positive cases within the Institution." Id. at ¶27 (underlining omitted). On September 3, 2020, KMCI instituted "a momentary lock-down and halt of movement in the late evening hours," which the plaintiff says "was done to move 'other' inmates that had tested positive for Covid-19 within the

4
Case 2:23-cv-01208-PP   Filed 07/18/24   Page 4 of 20   Document 13

Institution." Id. at ¶28. He alleges that on September 4, 2020, about twenty-five incarcerated persons were told they were moving to other housing units. Id. at ¶29. The plaintiff says that he "was told to move to Unit 11" with about eight other incarcerated persons. Id. at ¶30. Staff informed this group that six persons had been removed from Unit 11 the previous night after testing positive for COVID-19. Id. The plaintiff says that Unit 11 "is a regular housing Unit" in which all persons share a community bathroom, shower, phone "and other loving [*sic*] quarters." Id. at ¶31.

The plaintiff alleges that Sergeant Kretchmann told him he would be housed with an incarcerated person named Jose Alverez, whose previous cellmate had contracted COVID-19. Id. at ¶32. The plaintiff says that Alverez was feeling sick, and that he and "a few others" in Unit 11 complained to "C.O's (Correctional Staff) . . . that they were feeling ill; and maybe should be quarantine[d] as well." Id. The plaintiff says that he "immediately went to the staff (Sergeant Kretchmann), to request to be placed in a room with someone whom he had just came from Unit 16 with" because none of those incarcerated persons had tested positive for COVID-19. Id. at ¶33. He alleges that Kretchmann told him, "No, who I place you in a cell with is where [*sic*] you'll stay." Id. at ¶34. The plaintiff says he protested that Alverez was feeling ill, and that the plaintiff "had a compromised immune system and was concern[ed] with getting COVID." Id. Kretchmann reiterated that he "was in charge of assigning each new arrival with their new cellmates and who was in each room." Id. The plaintiff says that he "was informed that he would not be

5
Case 2:23-cv-01208-PP   Filed 07/18/24   Page 5 of 20   Document 13

moving; or if he had an issue to 'take it up with Unit Manager Tammy Steaheler [*sic*]," who moved him from Unit 16 to Unit 11. Id. at ¶35. He says Kretchmann also told him that he could write to Sabbish, the manager of Unit 11. Id. He alleges that Kretchmann advised him that if he "'didn't move into the cell, it would be considered as a refusal and [he] would be placed in "The Hole" (Segregation status).'" Id.

The plaintiff says that he was not provided cleaning supplies in Unit 11. Id. at ¶36. He asked Kretchmann and the John Doe Sergeant on First Shift for cleaning supplies. Id. at ¶¶36–37. He says the Doe sergeant told him "that the cleaning of rooms and handing out of supplies were not done after 9 a.m." Id. at ¶37. The plaintiff alleges that he also "was informed" that he would not be moved to another cell "despite informing staff that [he] had existing health issues and Cardiac issues." Id. The plaintiff alleges that even though the persons who tested positive were moved from Unit 11, others who "complained of being sick and showed symptoms were left on Unit 11 and was still open to have others move into their quarters and move and go to and from freely to work daily throughout the Institution." Id. at ¶39. He alleges that despite having quarantine units, Staehler and Sabbish "did not stop movements throughout the Institution" and "moved a group of negative cases into a Unit with those that were exposed to COVID-19; and into rooms with those sick and ill, exhibiting symptoms." Id. at ¶¶40–41 (capitalization omitted).

The plaintiff says that he "eventually became very ill" after being around Alverez and other symptomatic persons. Id. at ¶¶42–43. He says that he wrote

to Staehler, Sabbish and Assistant Warden Noble to inform them "that he was moved into a room that was not sanitized and his cellmate was sic[k]." Id. at ¶43. He says that around September 8 and 17, 2020, he also wrote to Security Director Pollard, Noble and Health Services Manager Ludwig "about his concern of being placed on the cell with someone whom [sic] had COVID and was sick," about not being able to sanitize his cell and about his underlying health issues. Id. at ¶44. He says that he received no response. Id. The plaintiff says that on September 15 and 17, 2020, he complained to Ludwig that "he was experiencing really bad symptoms, chest pains, headaches, eyesight issues and coughing up blood." Id. at ¶45. The plaintiff says he still received no response to his letters, and that there was "no response to correct or change [his] situation." Id. at ¶46.

The plaintiff alleges that on September 23, 2020, KMCI conducted another mass testing, which revealed "hundreds of cases" of COVID-19 within the prison. Id. at ¶47. The plaintiff says that Fessahaye reported "[a]s early as March 2020" and again in October 2020 that KMCI had "the ability, space and resources of living units to quarantine and isolate areas to stop the spread . . . if protocols, guidelines and proper procedures are exacted." Id. at ¶¶48–49. He says that Fessahaye assured media that "'mixing and matching Positive and Negative cases within the [institutional] setting IS NOT A Practice and it is contrary to mandated practices and guidelines.'" Id. at ¶49. The plaintiff asserts that Fessahaye "failed to ensure KMCI was safe and Inmates in their care were protected." Id. at ¶50. He contends that by allowing institutional

7

transfers to continue during the COVID-19 pandemic, Fessahaye "acted deliberately indifferent in her actions" and violated his Eighth Amendment rights. Id. at ¶52.

The plaintiff alleges that Warden McDermott "was on daily notice . . . of the impending COVID-19 environment, and the status of Negative and Positive cases." Id. at ¶53. He says that she nonetheless "decided to deliberately act indifferent to stop staff and Prison officials from carrying out guidelines, or procedures that housed negative and positive cases with each other." Id. The plaintiff asserts that McDermott's "failure to stop and properly cease such moving procedures within her institution contributed to the Plaintiff being moved, his placement in an unsafe environment and unprotected space and contracting COVID and becoming extremely ill." Id.

The plaintiff asserts that Noble, as Deputy Warden, "has one and the same responsibility as an acting Warden . . . for the safe and protected environment at KMCI." Id. at ¶54. He reiterates that Noble did not respond to his letters expressing his concerns about the conditions at KMCI, but that "he was aware of the risk and dangers of combining Pos[i]tive and Negative cases of covid." Id. He asserts that Noble's failure to respond to him, "change his situation or intervene . . . contributed Personally" to plaintiff contracting COVID and becoming ill. Id.

The plaintiff alleges that as the Security Director, Pollard was responsible for ensuring the safety of all persons incarcerated at KMCI. Id. at ¶55. He asserts that Pollard "knew the risk of contracting covid, and what could

happen to ANYONE exposed to Covid-19; yet fail to act accordingly to stop or change the Plaintiffs situation and in his action failed to protect Plaintiff." Id.

The plaintiff alleges that Unit Managers Staehler and Sabbish "both acted deliberately indifferent in the action of taking personal liability and responsibility" when they moved him "from a Covid free zone to an environment where there were Positive cases and close contacts cases." Id. at ¶56. He says that their actions failed to protect him from contracting COVID-19 and violated his rights under the Eighth Amendment. Id.

The plaintiff asserts that Health Services Manager Ludwig knew his concerns "about his exposure to covid-19 and his concern of becoming ill" but failed to take any action to protect him from being infected. Id. at ¶57. He says health services staff did not see him despite him writing to them about his concerns "several times." Id.

The plaintiff asserts that Sergeant Kretchmann "denied him the ability to properly clean and sanitize the room," even though he knew that the plaintiff's cellmate (Alverez) was symptomatic. Id. at ¶58. He asserts that Kretchmann could have housed him with a non-symptomatic cellmate from Unit 16 but forced him to house with an ill cellmate. Id. at ¶59. He says these actions violated Kretchmann's "duty to ensure [the plaintiff was] protected from harm and receive[d] appropriate care" and violated his rights under the Eighth Amendment. Id. at ¶60.

The plaintiff asserts that Supervisory Sergeants John/Jane Does 1 and 2 "denied him the ability to be placed in a safe confines of a cell and failed to

intervene when he was . . . placed in a cell with someone with Covid." Id. at ¶61. He says that the Doe sergeants also "denied him the ability to clean and sanitize the covid infested cell upon moving to Unit 11." Id. at ¶62. He newly claims that "it is staff[']s discretion to allow cleaning of a room at ANY TIME." Id. He says that all sergeants denied him proper protective equipment, "which was mandated by rules and regulation guidelines." Id. at ¶63.

Finally, the plaintiff asserts that Advance Health Care has contracted to provide "Health and Safety protocols and guidelines" at KMCI, which he says "includes the housing and placements of [incarcerated persons] in KMCI and quarantine rules established by the CDC, DHS." Id. at ¶64. He asserts that Advance and KMCI instead "adopted their own arbitrary protocols and regulations that went against established safety rules and guideline, which made their actions unconstitutional." Id.

The plaintiff seeks $700,000 in compensatory and punitive damages under federal and state law. Id. at p.17. He seeks an additional $100,000 in punitive damages from each defendant and "for the Institution to establish a better and safer guideline when dealing with pandemics and infectious diseases." Id.

C. Analysis

As the court explained in the previous order, the plaintiff's allegations about the conditions of his confinement implicate the Eighth Amendment. See Dkt. No. 9 at 9 (citing Giles v. Godinez, 914 F.3d 1040, 1051 (7th Cir. 2019); Rhodes v. Chapman, 452 U.S. 337, 345–47 (1981)). As the court explained,

"only 'extreme deprivations' will amount to cruel and unusual conditions of confinement," and the court "must judge the alleged conditions 'in accordance with contemporary standards of decency.'" Giles, 914 F.3d at 1051 (citing Hudson v. McMillian, 503 U.S. 1, 8–9 (1992); Rhodes, 452 U.S. at 346). The plaintiff must allege facts that show that he has been deprived of "'the minimal civilized measure of life's necessities.'" Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quoting Rhodes, 452 U.S. at 347). He also must demonstrate that the defendants acted with "deliberate indifference" to a substantial risk that he would suffer serious harm. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Wilson, 501 U.S. at 303.

The court explained in its March 11, 2024 order that "[o]ther courts in this district have analyzed similar or nearly identical complaints from persons who were incarcerated at KMCI in September 2020 and alleged that the prison took inadequate steps to prevent them from contracting COVID-19." Dkt. No. 9 at 9–10. The court reviewed decisions from those other courts, which rejected claims that did not adequately link the defendants' action or inaction to the plaintiff's potential exposure to COVID-19. Id. at 10–12 (discussing Williams v. McDermott, Case No. 22-C-1003, 2022 WL 17961667 (E.D. Wis. Dec. 27, 2022); and Martinez v. McDermott, No. 23-CV-1209, 2023 WL 6976742 (E.D. Wis. Oct. 23, 2023)). The court opined that those cases were "instructive" to the court's screening of the plaintiff's original complaint. Id. at 12. It dismissed defendants Fessahaye, McDermott, Noble and Pollard because the original complaint generally alleged only that those defendants were supervisors at

11
Case 2:23-cv-01208-PP   Filed 07/18/24   Page 11 of 20   Document 13

KMCI in 2020 who were in some way involved with the institution's COVID-19 protocol, but it did not explain how those defendants "also were *personally* responsible for the plaintiff getting sick from this specific incident." Id. at 14 (citing Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000)).

The plaintiff has updated the "Claims for Relief" section of his amended complaint by inserting the word "personal" throughout his claims. But as the court explained in the March 11, 2024 screening order, the facts on which those claims rely are identical to those alleged in the original complaint, and they failed to connect the named defendants to the plaintiff's alleged harm. For the same reasons the court gave in the March 11, 2024 order, the amended complaint does not state a claim against defendants Fessahaye, McDermott, Noble and Pollard because it fails to allege facts that demonstrate a personal connection between those defendants and plaintiff's alleged harm. Id. at 12–14. That those defendants oversaw many of the prison's decisions during the COVID-19 pandemic does not mean that they personally were responsible for the plaintiff becoming ill in 2020. The amended complaint, like the original, fails to provide a factual link between those defendants and the plaintiff contracting COVID-19 in September 2020.

Nor does the amended complaint state a claim against Unit Managers Staehler and Sabbish, for the reasons the court gave in the March 11, 2024 order. Id. at 14–15. The amended complaint reiterates the plaintiff's allegations against Staehler and Sabbish, which, as the court stated in the March 11 order, "suggest[] that they acted reasonably to mitigate the spread of COVID-

19" though many persons still became sick. Id. at 15. As the court explained, "The key inquiry is not whether the defendants perfectly responded . . . the key inquiry is whether they responded reasonably to the risk." Id. (quoting Thomas v. McDermott, Case No. 23-CV-734, 2023 WL 6463046, at *3 (E.D. Wis. Oct. 4, 2023) (internal quotation omitted). The plaintiff's re-stated allegations suggest that Staehler and Sabbish made mistakes and may have acted negligently during the COVID-19 pandemic. But "neither those mistakes nor their alleged negligence is a basis for liability under §1983." Id.

The amended complaint does not state a claim against defendant Ludwig for the reasons the court previously explained. As in the original complaint, the amended complaint "alleges only that [plaintiff] wrote to Ludwig about his concerns on two occasions but did not receive a response." Id. The plaintiff still does not explain what role, if any, Ludwig had in the plaintiff contracting COVID-19 at KMCI in September 2020. Id. His allegation that Ludwig's "personal inaction . . . contributed to" the plaintiff becoming sick is vague and fails to explain how Ludwig "'caused or participated in a constitutional violation.'" Id. (quoting Hildebrant v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003)).

In the March 11, 2024 screening order, the court did not allow the plaintiff to proceed against Sergeant Kretchmann for allegedly not allowing the plaintiff to move to another cell and telling him to write to the Unit Managers. Id. at 16. The amended complaint restates these allegations but newly alleges that Kretchmann told the plaintiff that he was in charge of deciding where new

13

arrivals would be housed, and saying that the plaintiff would remain in the cell to which he was assigned and with the assigned cellmate. The fact remains that the plaintiff "does not have a constitutional right to placement in a certain cell, especially during an emergency situation like the COVID-19 pandemic." Id. (citing Meachum v. Fano, 427 U.S. 215, 225 (1976); Brown v. Cromwell, Case No. 22-CV-010, 2022 WL 489529, at *3 (E.D. Wis. Feb. 16, 2022)). Although the plaintiff expressed concern that Alverez was feeling ill, the plaintiff does not allege that Alverez had tested positive or that he otherwise knew Alverez had COVID-19. That means that Kretchmann was not aware of an "imminent danger of a substantial harm" from the plaintiff being housed with Alverez. Brown, 2022 WL 489529, at *3 (citing Lindh v. Hepp, Case No. 21-C-801, 2021 WL 3473141, at *4 (E.D. Wis. Aug. 6, 2021)). Disregarding the plaintiff's concern and preference not to be housed with Alverez did not violate the plaintiff's constitutional rights.

The plaintiff seeks to proceed against the John Doe sergeants for not providing him with cleaning supplies. The court previously rejected this claim because the plaintiff alleged that the "sergeants denied his request to move to another cell and denied him cleaning supplies on one occasion because they were not available at the time." Dkt. No. 9 at 16. The amended complaint reiterates those allegations but newly alleges that "staff" also had discretion to allow room cleaning at any time. Even assuming that "staff" includes the Doe sergeants (which the amended complaint does not say), allegations that incarcerated persons were denied cleaning supplies would state Eighth

Amendment violations "only in extreme circumstances." Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016) (citing cases). The plaintiff does not allege that his cell was filthy like the cases cited in Gray. He alleges only that he believed the cell was unsanitary because someone who tested positive for COVID-19 had been there the previous evening. Those are not "extreme circumstances" sufficient to support an Eighth Amendment claim. Perhaps the Doe sergeants could have allowed plaintiff cleaning supplies on demand. But their decision to adhere to rules about cleaning supplies, particularly at a time when much remained uncertain about best practices for protecting against the virus that caused COVID-19, was not deliberate indifference.

The amended complaint newly seeks to proceed against the defendants in their official capacities. Claims against a state employee in his official capacity represent another way to plead an action against the entity that he represents or for which the official works. Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690, n.55 (1978)). The court construes the plaintiff's claims against the defendants in their official capacities as having been brought against the Wisconsin Department of Corrections, the agency for which they work. Id. at 165–66. Claims against the Department of Corrections are "no different from a suit against the State itself," so the court construes these claims as if the plaintiff had brought them against the State of Wisconsin. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) (citing Graham, 473 U.S. at 165–66; Monell, 436 U.S. at 690 n.55). But "neither a State nor its officials acting in

their official capacities are 'persons' under § 1983." Id. That means the plaintiff may not proceed against the defendants in their official capacities to recover damages. See Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 617 (2002); Williams v. Wisconsin, 336 F.3d 576, 580 (7th Cir. 2003).

The plaintiff also asks the court to order KMCI to establish guidelines for handling future pandemics or disease outbreaks. Injunctive relief is available under §1983 against state officials acting in their official capacities. See Will, 491 U.S. at 71 n.10 (citing Graham, 473 U.S. 159, 167 n.14 (1985), and Ex Parte Young, 209 U.S. 123, 159–60 (1908)). But the plaintiff is not incarcerated at KMCI and has not been incarcerated there since June 16, 2022. See https://appsdoc.wi.gov/lop/details/detail (DOC #278616). That means that there is no continuing violation of his federal rights that the court can enjoin. See Kress v. CCA of Tenn., LLC, 694 F.3d 890, 894 (7th Cir. 2012) (citing Green v. Mansour, 474 U.S. 64, 73 (1985); and quoting Al–Alamin v. Gramley, 926 F.2d 680, 685 (7th Cir. 1991) ("'When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.'")). And the plaintiff cannot seek injunctive relief on behalf of current or future persons incarcerated at KMCI. See Lewis v. Casey, 518 U.S. 343, 349–50 (1996); Massey v. Helman, 196 F.3d 727, 739–40 (7th Cir. 1999).

The amended complaint contains some new allegations about Advance Health Care's role at the prison, which the plaintiff says involved implementing "Health and Safety protocols and guidelines" for housing and evaluating incarcerated persons. Dkt. No. 12 at ¶64. He says these included "what were the

best housing situations for the overall population; and who could be moved and when." Id. The court explained in the March 11, 2024 order that "[a] private corporation that has contracted to provide essential government services may be held liable only when 'the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself.'" Dkt. No. 9 at 17 (quoting Shields v. Ill. Dep't of Corr., 746 F.3d 782, 789 (7th Cir. 2014)). The plaintiff must allege "that his injury was caused by a [corporation's] policy, custom, or practice of deliberate indifference . . . or a series of bad acts that together raise the inference of such a policy." Shields, 746 F.3d at 796 (citing Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 927 (7th Cir. 2004)).

The plaintiff alleges that Advance Health Care was responsible for implementing the housing and quarantine policies and procedures that led to him becoming ill. But as the court has explained, the amended complaint does not allege facts suggesting that these policies were *indifferent* to the risk of COVID-19 to incarcerated persons; at most, the amended complaint suggests that the policies were imperfect, which does not violate the Eighth Amendment. It may be easy to judge the efficacy of Advance Health Care's housing and quarantine policies as problematic with the benefit of hindsight. But the court must give some deference to the judgment of prison officials in March 2020, when they were struggling to determine the best course of action to combat the spread of COVID-19. See Money v. Pritzker, 453 F. Supp. 3d 1103, 1137 (N.D. Ill. 2020) (recognizing "the deference that is due to prison authorities to

determine which additional measures must be taken to avoid catastrophic results" during the early stages of the COVID-19 pandemic).

The amended complaint does not state a federal claim for many of the same reasons that the original complaint did not. Even if some KMCI officials, including some named defendants, did not act ideally, "that does not mean they acted *indifferently* to the risk that persons incarcerated at KMCI would become sick, particularly given the rapidly changing and uncertain nature of events and guidance in 2020." Dkt. No. 9 at 18. The amended complaint does not state a claim for which a federal court may grant relief.

Because the amended complaint does not state a federal claim, the court will not exercise its supplemental jurisdiction over any potential state law claim. See id. (citing Williams, 2022 WL 17961667, at *4. The court will dismiss any state law claims without prejudice pursuant to 28 U.S.C. §1367(c)(3).

### III. Conclusion

The court **CONCLUDES** that the plaintiff's amended complaint fails to state a claim. Dkt. No. 12.

The court **ORDERS** that this case is **DISMISSED** under 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1) because the amended complaint fails to state a claim.

The court will document that the plaintiff has incurred a "strike" under 28 U.S.C. §1915(g).

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by

18

Case 2:23-cv-01208-PP   Filed 07/18/24   Page 18 of 20   Document 13

determine which additional measures must be taken to avoid catastrophic results" during the early stages of the COVID-19 pandemic).

The amended complaint does not state a federal claim for many of the same reasons that the original complaint did not. Even if some KMCI officials, including some named defendants, did not act ideally, "that does not mean they acted *indifferently* to the risk that persons incarcerated at KMCI would become sick, particularly given the rapidly changing and uncertain nature of events and guidance in 2020." Dkt. No. 9 at 18. The amended complaint does not state a claim for which a federal court may grant relief.

Because the amended complaint does not state a federal claim, the court will not exercise its supplemental jurisdiction over any potential state law claim. See id. (citing Williams, 2022 WL 17961667, at *4. The court will dismiss any state law claims without prejudice pursuant to 28 U.S.C. §1367(c)(3).

### III. Conclusion

The court **CONCLUDES** that the plaintiff's amended complaint fails to state a claim. Dkt. No. 12.

The court **ORDERS** that this case is **DISMISSED** under 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1) because the amended complaint fails to state a claim.

The court will document that the plaintiff has incurred a "strike" under 28 U.S.C. §1915(g).

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by

filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed another "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what further action, if any, is appropriate in a case.

Dated in Milwaukee, Wisconsin this 18th day of July, 2024.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**